RENDERED: APRIL 8, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1259-WC

TERI STURGILL                                                    APPELLANT

v.              PETITION FOR REVIEW OF A DECISION
                OF THE WORKERS' COMPENSATION BOARD
                ACTION NO. WC-19-63163

KING'S DAUGHTERS MEDICAL
CENTER; KING'S DAUGHTERS
FAMILYPHARMACY; MOHAMAD
ABDUL-KHOUDOUD, MD, KDMS
PULMONARY AND CRITICAL
CARE MEDICINE; HONORABLE
CHRISTINA HAJJAR, ADMINISTRATIVE
LAW JUDGE; AND WORKERS'
 COMPENSATION BOARD                                              APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; CETRULO AND GOODWINE,
JUDGES.

CETRULO, JUDGE:  Appellant Teri Sturgill ("Teri") appeals the October 1, 2021 Workers' Compensation Board (the "Board") opinion affirming Honorable Christina D. Hajjar's ("ALJ")[1] opinion and order dismissing Teri's claim against King's Daughters Medical Center ("KDMC") for permanent income and medical benefits.  Upon review, we affirm the Board's opinion.

## I.    FACTUAL HISTORY

### a.  Work History

Teri worked as a dietary clerk for KDMC from 2004 to 2020.  In that role, Teri worked on an assembly line in the KDMC kitchen and prepared patient meal trays.  Teri claims that during the last two years of her employment she was exposed to bleach or bleach products, which resulted in an occupational disease.  Teri claims her "airway injuries, collapsed lungs, severe coughing, shortness of breath, and high blood pressure" started with her first exposure to bleach on December 4, 2018 (the "initial exposure").  On that date, while Teri was working in the KDMC kitchen, her coworker poured a large jug of bleach into a clogged drain.  Teri testified[2] that she immediately had difficulty breathing, began coughing, and experienced shortness of breath.  Teri evacuated the area and used her inhaler seven times before going to KDMC's emergency care.

---

[1] Administrative Law Judge.

[2] Teri testified at a June 2020 deposition and a February 2021 hearing before the ALJ.

Teri testified that at the emergency care, she received breathing treatments, steroid shots, and a steroid regimen to take home. Later that month, Teri was seen by Dr. Abul-Khoudoud, her pulmonologist ("Pulmonologist"). The Pulmonologist's records indicated that she was "known to [him] for mild asthma."

Following the initial exposure, Teri was off work from December 2018 until May 2019. Once Teri returned to work, she experienced a couple more adverse reactions after exposure to bleach, which she detailed in her brief: in June 2019 when a coworker used Clorox spray near her; and August 2019 when a coworker used bleach sanitary wipes in her presence. After the August exposure, Teri again went to KDMC's emergency care and was taken off work until November 2019. Following each exposure, Teri would also see the Pulmonologist for general treatment, including steroid medication and inhaler use. After which, Teri testified, she would return to her health baseline.

When Teri returned to work in November 2019, KDMC transitioned her from a kitchen position to medical records in hopes of minimizing her contact with bleach. Unfortunately, that transition did not remove all possibility for exposure to bleach and Teri had another reaction in January 2020, when a coworker used bleach in the medical records department. After that exposure, KDMC placed her off work and informed her it could not offer her a job with zero

possibility of exposure because the reaction-inducing chemicals were located throughout KDMC.

Despite Teri's removal from exposure at KDMC, she continued to experience adverse reactions to chemicals after her employment ended: *e.g.*, at Lexington Clinic, when she experienced a reaction to an air freshener in a restroom; at University of Louisville, when she was exposed to bleach wipes; and at Rural King, when an employee used bleach.

### b. Medical History

Teri's medical records reflect that she had a history of breathing issues, with complaints of shortness of breath and persistent cough, that dated back to at least 2005. Many of these complaints started years before the initial exposure: in 2011, she presented with shortness of breath; in 2013, she presented with persistent cough for eight months; in 2015, she presented with chronic cough; in 2016, she presented with chronic cough "for months"; in 2017, she presented with chronic cough, blue around the mouth, and shortness of breath and she was referred to pulmonology to address those issues.

Additionally, in 2018 − the year before the initial exposure − Teri was actively treating for breathing issues. In January 2018, Teri presented to the Pulmonologist for complaints of dyspnea, wheezing, and her lips turning blue. The Pulmonologist recorded that his impression of her complaints was that she likely

had a reactive airway disease versus asthma. However, in February 2018, the Pulmonologist discussed Teri's "mild intermittent asthma" with her and prescribed a Breo Ellipta inhaler and Ventolin inhaler. Teri testified that she did not believe she had a formal diagnosis for asthma, but she acknowledged that the Pulmonologist did prescribe the Breo for her asthma.[3]

In April 2018 – eight months before the initial exposure – Teri was referred to Tina England, a nurse practitioner ("Nurse England"). Nurse England's report at that time stated that Teri was seen the week before in the ER for her hypertension, reported that she was short of breath the majority of the time, and that she was on Breo Ellipta and Ventolin. Teri also told Nurse England that she had raspy cough, occasional wheezing, and was not able to get a deep breath. Nurse England's report lists "asthma" in Teri's past medical history and describes the Pulmonologist as "Dr. M. Khoudoud – asthma." The primary diagnosis during that visit was essential hypertension and the assessment listed an abnormal chest x-ray. The report further noted that Teri wanted to lose weight before beginning antihypertensive medications.

---

[3] When KDMC counsel asked if she had been treated for asthma prior to the initial exposure, Teri stated, "I started taking Breo before this. But as for a formal diagnosis, I haven't really had it formal. But that's what [the Pulmonologist] was giving me that for, asthma."

### c. Evaluating Physicians

Dr. Broudy (the "Defense Evaluator") conducted independent medical evaluations ("IME") of Teri in February 2020 and December 2020. He opined that Teri had asthma or reactive airway disease syndrome. Further, he noted that she had been diagnosed with asthma prior to the initial exposure and that "the predisposition to this condition existed prior to the alleged work injuries which can exacerbate her condition." During both IMEs, Teri's diagnostic testing[4] was normal, which the Defense Evaluator indicated meant she had no permanent impairment rating attributable to the work injury, *i.e.*, she was at a 0% impairment rating according to the *American Medical Association Guides to the Evaluation of Permanent Impairment*, 5th Edition (the "Guides").

Between her first and second IME with the Defense Evaluator, Teri was evaluated by Dr. Moldoveanu (the "University Evaluator") in June 2020. At that evaluation, the University Evaluator's impression was that Teri had work-exacerbated asthma, and he assessed a 10% whole person impairment rating according to the Guides, which he attributed fully to her work at KDMC. Notably, the University Evaluator's report indicated that Teri developed asthma after the initial exposure. The x-ray conducted at that evaluation showed "linear opacity LL

---

[4] The diagnostic testing included observation of x-rays, spirometry, lung volumes, diffusing capacity, and arterial blood gases.

base; likely atelectasis or scarring"[5] and the exercise test showed mild functional impairment due to "cardiovascular limitations. (this may reflect primary cardiac dysfunction or merely cardiac deconditioning.)". Importantly, though, the University Evaluator opined that "[i]t is very difficult to prove or disprove that this is the source of her asthma worsening other than her report of having no other clear source of allergens."

## II. PROCEDURAL HISTORY

### a. ALJ's Opinion

After a benefit review conference in January 2021 and a formal hearing in February 2021, the ALJ issued the June 2021 opinion and order. The ALJ found that Teri had not met her burden of proving that she sustained a permanent injury due to her work-related exposure to bleach, so the ALJ dismissed her claims. In the opinion, the ALJ noted that Teri relied on the University Evaluator's findings. However, the ALJ determined that the University Evaluator's opinions did not constitute substantial evidence.

The ALJ prefaced her determination by explaining that pursuant to KRS[6] 342.315, the fact finder (here, the ALJ) must afford the University Evaluator's findings presumptive weight *unless* there is a reasonable basis for not

---

[5] KDMC claims these findings were present prior to the initial exposure.

[6] Kentucky Revised Statute.

doing so. KRS 342.315(2); *see also Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky. 2000). The ALJ then explained that in this case there was a reasonable basis for rejecting such clinical findings and opinions. KRS 342.315(2); *see also Bullock v. Goodwill Coal Co.*, 214 S.W.3d 890 (Ky. 2007).

Accordingly, the ALJ rejected the University Evaluator's findings of causation and permanency because "he had a limited and inaccurate understanding of [Teri's] prior medical condition." The ALJ cited to *Cepero v. Fabricated Metals Corporation* to explain that "[m]edical opinions that are based upon inaccurate or incomplete information furnished by the claimant during the independent medical examination do not constitute substantial evidence to support a finding of work-related causations." 132 S.W.3d 839 (Ky. 2004). The ALJ noted that the University Evaluator's findings fell under this exception to KRS 342.315 because "he relied on [Teri's] temporal association with the asthma symptoms with exposure to her work environment[,]" despite Teri's history with breathing difficulties that predated the initial exposure.

The ALJ supported this finding by clarifying that the University Evaluator failed to provide evidence that he reviewed Teri's prior treatment records, "which showed significant treatment in the year leading up to the first exposure." Further, the University Evaluator was under the false impression that Teri was prescribed Breo *after* the initial exposure. The ALJ recounted that the

University Evaluator's "impairment rating was only based upon the fact that she has been diagnosed with asthma and she is taking medication for such asthma. However, the prior treatment records show that [the Pulmonologist] treated [Teri] for shortness of breath and wheezing, and he prescribed the same medications [Teri] is currently taking before [the initial exposure]." Lastly, the University Evaluator's opinion was "equivocal." He stated that "[i]t is very difficult to prove or disprove that this is the source of her asthma worsening other than her report of having no other clear sources of allergens."

Alternatively, the ALJ noted that the Defense Evaluator opined that Teri had preexisting respiratory disease and was sensitive to certain substances, but that it did not mean that her asthma was caused by her work at KDMC and/or permanently worsened by it. Additionally, the ALJ recognized that the Defense Evaluator stated Teri had an active condition and diagnosis before the initial exposure at KDMC, for which she was actively treating. As a result, the ALJ found the Defense Evaluator to be more credible and thoroughly documented her bases for disregarding the University Evaluator's opinions.

Following the ALJ's order, Teri petitioned for reconsideration; however, on June 29, 2021, the ALJ overruled that as "an impermissible re-argument of the merits of the claim."

### b. Board's Opinion

Then, Teri appealed to the Board and alleged that the ALJ's decisions were not based on substantial evidence because they were contrary to the University Evaluator's findings. The matter was briefed by the parties, and on October 1, 2021, the Board issued its opinion. After a lengthy recitation of the record and the factual findings of the ALJ, as well as its own review of the University Evaluator's report and Teri's pre-exposure in medical records, the Board affirmed the ALJ's opinion.

The Board concluded that the ALJ did not err in finding that the University Evaluator did not have and/or adequately review Teri's medical history. The Board noted that the University Evaluator did not list asthma as a preexisting condition, nor did he indicate that he reviewed any medical records relating to medical treatment prior to the initial exposure when he was "formulat[ing] his opinions." The Board also found that the records contradicted both her testimony in this case as well as the history she gave to the University Evaluator. Specifically, the Board noted that the KDMC Pulmonary and Gastroenterology records contradicted Teri's testimony that her symptoms did not begin until after the initial exposure. Further, those records reflected that the University Evaluator was mistaken in his statement that Teri was not prescribed breathing medications until after the initial exposure.

Accordingly, the Board determined that the ALJ's finding that the University Evaluator had a limited and inaccurate understanding of Teri's prior medical records was amply supported by the record. Further, the Board found that the prior medical records, as well as the opinions of the Defense Evaluator, constituted substantial evidence upon which the ALJ could rely to reach a decision on the merits and reject the University Evaluator's findings. Ultimately, the Board found the conflicting evidence did not compel a different result, and thus the Board determined that it was without authority to disturb the ALJ's opinion.

Finally, Teri appealed the Board's decision and now argues the Board erred when (1) it assumed Teri's asthma predated the initial exposure; and (2) it determined the ALJ did not err when it found the University Evaluator's opinion was not supported by substantial evidence and refused to consider it.

## III. STANDARD OF REVIEW

When we review a decision of the Board, we will only reverse where the Board has overlooked or misconstrued the controlling law or so flagrantly erred in evaluating the evidence that a gross injustice has occurred. *Daniel v. Armco Steel Co., L.P.*, 913 S.W.2d 797, 798 (Ky. App. 1995). Ultimately, we must review the ALJ's decision to properly analyze that of the Board.

Regarding the ALJ's decision, the Kentucky Supreme Court has held that when the ALJ finds against the party with the burden of proof, as here, then

-11-

the reviewing court may only reverse if the evidence compels a finding in the favor of that party. *Daniel*, 913 S.W.2d at 779-800; *see also Lee v. Int'l Harvester Co.*, 373 S.W.2d 418, 420-21 (Ky. 1963). In addition, as the finder of fact, the ALJ – not this Court and not the Board – has sole "discretion to determine the quality, character, and substance of the evidence." *Whittaker v. Rowland*, 998 S.W.2d 479, 481 (Ky. 1999) (quoting *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985)). Not only does the ALJ weigh the evidence, but the ALJ may also choose to believe or disbelieve any part of the evidence regardless of its source. *Id.* (quoting *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977)).

## IV. ANALYSIS

### a. Board's Determination of Teri's Asthma Timeline

First, Teri argues the Board erred when it assumed Teri's asthma predated the initial exposure. Teri contends that the Board was correct when it stated she was treated for wheezing and shortness of breath and had been prescribed Breo and an inhaler several months before her first alleged exposure. However, Teri "take[s] exception" with the Board's statement that "it is clear that approximately 9 to 10 months prior to [the initial exposure], [Teri] was prescribed Breo and an albuterol inhaler for asthma and multiple breathing conditions."

We disagree with Teri's interpretation. Teri clearly stated in her June 2020 deposition that the Pulmonologist "was giving [her] [Breo] for that, asthma."

-12-

The Board essentially repeated Teri's words back to her, and yet she still disagrees with them. Her argument has no merit. Further, in numerous medical reports Teri's doctors and nurse referenced Teri's asthma.[7] The Board's statements were supported by substantial evidence cited throughout the record and we find no error in the Board's determination.

### b. Applicability of University Evaluator's Findings

Second, Teri argues the Board erroneously determined that the ALJ's decision to reject the University Evaluator's opinion was proper. Specifically, Teri argues the ALJ did not properly apply *Cepero* because the ALJ did not prove that it was "irrefutable" that the University Evaluator's medical history was corrupt.[8] We disagree.

Teri claims that the University Evaluator made "direct and indirect" references to her prior history when he noted that she had been seen by the Pulmonologist and listed some past medical history. Notably, the University Evaluator did not specify which visits with the Pulmonologist he evaluated. He

---

[7] Namely, her primary care physician, Nurse England, noted Teri's asthma in multiple locations in her reports; and the Pulmonologist stated he had discussions with Teri concerning her "mild intermittent asthma" and prescribed her medication for her asthma.

[8] In addition to her reliance on *Cepero*, Teri cites to an unpublished case. However, unpublished opinions "shall not be cited or used as binding precedent in any other case . . ." unless "there is no published opinion that would adequately address the issue before the court." Kentucky Rule of Civil Procedure 76.28(c). Because *Cepero* is a published case on point, we are bound by its holding and will analyze that opinion alone.

simply stated that Teri "has been seen by [the Pulmonologist,]" which is not entirely helpful because Teri saw the Pulmonologist both before and after the initial exposure, and the University Evaluator may have been referencing only the later visits.

Luckily, the *Cepero* facts are quite similar to those found here and provide clarity on when a university evaluator's opinions may be deemed insufficiently supported. *Cepero*, 132 S.W.3d at 839. There, Appellant Cepero was injured on the job when he fell and sustained a knee injury. *Id.* at 840. His employer then referred him to a health center and Cepero told those medical providers about the incident at work. *Id.* After that, Cepero saw a different doctor and explained that he had broken his knee a few years earlier, which had resulted in wheelchair confinement. *Id.* At that appointment, he did not mention the work injury that had occurred the week before. *Id.* That doctor referred Cepero to orthopedic surgeons and he ultimately had two knee surgeries. *Id.* The orthopedic surgeons "attributed the cause of [Cepero's] present disability" to the initial injury that predated the work-related fall. *Id.*

Cepero then saw another doctor, upon referral from his attorney. *Id.* That doctor's report referred only to the history of the work-related accident and did not mention the initial broken knee. *Id.* "Unsurprisingly, [that doctor] attributed [Cepero's] knee injury entirely to the work-related accident." *Id.* at 841.

-14-

In the face of those inconsistencies, Cepero denied any prior knee injury. *Id.* When Cepero was confronted with information regarding his past broken knee, he minimized the injury. *Id.* "Despite [Cepero's] contradictory testimony . . . the ALJ concluded that [Cepero's] injury was caused by the [work accident]." *Id.* at 842. Importantly, the Board reversed that decision because it found the ALJ's conclusion was not supported by substantial evidence. *Id.* Then, this Court and our Supreme Court, affirmed. *Id.*

Our Supreme Court emphasized that "[s]ubstantial evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Id.* (quoting *Smyzer v. B.F. Goodrich Chem. Co.*, 474 S.W.2d 367, 369 (Ky. 1971)). The issue, our Supreme Court explained, was "whether [the initial broken knee] caused the [present injury], which all of the physicians identified as the cause of Appellant's present disability." *Id.*

"Where the question at issue is one which properly falls within the province of medical experts, the fact-finder may not disregard the uncontradicted conclusion of a medical expert and reach a different conclusion." *Id.* (quoting *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky. 2000)). Like here, in *Cepero*, there "were contradictory medical conclusions, some based on an accurate history and others based on an inaccurate history." *Id.* This was because Cepero told some

doctors about his previous injury but failed to tell other doctors that he had previously broken his knee. *Id.* Under those circumstances, the Board deemed it irrefutable that the orthopedic surgeons' opinions of Cepero were corrupt because they were not fully aware of his medical history.[9] *Id.*

Accordingly, the "Board concluded that the opinions as to causation expressed in the medical reports of [the orthopedic surgeons] were not of sufficient 'fitness to induce conviction in the minds of reasonable men' because those opinions relied upon inaccurate or incomplete information[.]" *Id.* Specifically, Cepero did not mention his previous injury to the orthopedic surgeons; therefore, the Board concluded that their determination regarding his injury was not based on accurate and complete information. *Id.*

Cepero asked our Supreme Court to "infer that [the orthopedic surgeon] must have known of the history given to [another doctor] because his report states that his opinion as to causation is '[b]ased upon client [sic] history, medical records, and physical examination.'" *Id.* at 843. Our Supreme Court refused to do so. *Id.*

Here, Teri makes an identical request and claims that because the University Evaluator made "direct and indirect" references to her medical history,

_____

[9] "[I]n cases such as this, where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence."

it was inaccurate to conclude that the history he reviewed was incomplete. Our precedent does not allow such conclusion. *Id.* Instead, "[i]n the absence of proof, we will not assume that any competent medical examiner would be aware of but fail to mention a history of a prior injury to the exact same part of the body for which compensation is sought . . . . *We assume, instead, that* [*the doctor*] *was unaware of that history.*" *Id.* (emphasis added).

We, too, will not assume that the University Evaluator was aware of but failed to mention Teri's extensive and immediately preceding history of breathing issues. Instead, we must assume that the University Evaluator was unaware of that history. The University Evaluator's reliance on such incomplete history rebuts the presumption that a university evaluator's opinions are substantial evidence. Therefore, it was not improper for the ALJ to conclude that the University Evaluator's opinion was not adequate, and it was not improper for the Board to uphold that decision.

In conclusion, "[t]he view of the evidence which was taken by the ALJ, [and] the Board [ ] was neither patently unreasonable nor flagrantly implausible, and we are not persuaded that any controlling statute or precedent was overlooked, misapplied, or misconstrued." *Whittaker*, 998 S.W.2d at 482. The Board sufficiently determined that the evidence does not compel a reversal of the ALJ's opinion. Consequently, we do not find the Board to have overlooked or

misconstrued the controlling law or flagrantly erred such that a gross injustice occurred.  *Daniel*, 913 S.W.2d at 798.

## V.  CONCLUSION

For these reasons, we affirm the Board's decision to uphold the ALJ's opinion and order concluding that the University Evaluator did not provide sufficient evidence and the ALJ properly dismissed Teri's claims.  AFFIRMED.

ALL CONCUR.


BRIEF FOR APPELLANT:

Jeffrey D. Hensley
Russell, Kentucky

BRIEF FOR APPELLEE KING'S
DAUGHTERS MEDICAL CENTER:

Keri E. Hieneman
W. Mitchell Hall
Ashland, Kentucky