RENDERED:  MARCH 10, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1318-WC

JENNIFER WHISMAN                                          APPELLANT


                        PETITION FOR REVIEW OF A DECISION
v.                      OF THE WORKERS' COMPENSATION BOARD
                        ACTION NO. WC-21-00540


TOYOTA MOTOR
MANUFACTURING KENTUCKY,
INC.; HONORABLE W. GREG
HARVEY, ADMINISTRATIVE LAW
JUDGE; AND WORKERS'
COMPENSATION BOARD                                        APPELLEES


                            OPINION
                            AFFIRMING

                        ** ** ** ** **

BEFORE:  JONES, KAREM, AND LAMBERT, JUDGES.

JONES, JUDGE:  The appellant, Jennifer Whisman, seeks review of the October

13, 2022, opinion of the Workers' Compensation Board ("Board").  Therein, the

Board affirmed the Administrative Law Judge's ("ALJ") dismissal of Whisman's

occupational disease claim. Having reviewed the record and being otherwise sufficiently advised, we affirm the Board.

## I. BACKGROUND

Whisman began working at Toyota Motor Manufacturing Inc., ("Toyota") on August 1, 2011, when Kelly Services, a temporary employment agency, assigned her to Toyota's Georgetown, Kentucky plant. Subsequently, she became a regular, fulltime Toyota employee on November 18, 2013; she continued working at Toyota's Georgetown plant until September 11, 2020, when she went on medical leave for her sinuses.

On April 1, 2021, Whisman filed a Form 102 Application for Resolution of an Occupational Disease Claim with the Kentucky Department of Workers' Claims ("Department"). According to Whisman, while working at Toyota, she was exposed to coolant mist that contained Pseudomonas.[1] Whisman alleges that inhaling the mist caused her to develop chronic sinusitis, and that her sinus cavities are now colonized with Pseudomonas.

The Board thoroughly and accurately summarized the proof in this case. We adopt the Board's summary as our own as follows:

> Whisman worked at various jobs, and in multiple parts of the facility while working for Toyota. Her last job there involved assembling four-cylinder engines. Whisman testified that in the past 10 years she has had no health

[1] Pseudomonas aeruginosa is a common bacteria found throughout the environment.

-2-

problems other than those involving her sinuses, except for two unrelated right knee surgeries. She began having problems with her sinuses in 2013 which initially caused some dizziness. She underwent sinus surgery by Dr. Ronald George Shashy in August 2014, and she returned to work at Toyota a couple of months later. She testified she is puzzled as to why Dr. Shashy's office notes indicate she was having problems due to exposure to mold in her home. She denied ever having such exposure. Whisman has smoked for over twenty years. At times, she smoked a pack of cigarettes per day, and she testified she currently smokes less than a pack per week.

Whisman's sinus problems flared up again in 2018. She has since treated with numerous otolaryngologists, physicians, allergists, and facilities for her conditions. She underwent a second sinusitis surgery by Dr. Michael Cecil on March 19, 2020, and she testified she has undergone three additional procedures since that date. She testified lab studies ordered by Dr. Cecil indicate she has a Pseudomonas bacterial infection. She has been on multiple regimens of various antibiotic treatments for her sinus infections. She testified these were not general antibiotics, but were tailored for her specific condition. Whisman received short-term disability benefits, then long-term disability benefits for the periods of work she missed from Toyota. She continues to receive the long-term disability benefits.

Whisman testified she believes her condition was caused by exposure to vapors and mists at Toyota. She does not believe she can return to work at Toyota due to her dizziness, blurred vision, breathing problems, and swelling. She also has varying symptoms including neck swelling, throat clearing, drainage, nose blowing, swollen lymph nodes/glands, and facial pain. Whisman contacted OSHA[2] who she indicated tested the machines at Toyota.

---

[2] Occupational Safety and Health Administration.

She noted the testing reflected Pseudomonas was present in a coolant used in the manufacturing process at Toyota.

Whisman filed a report from Ray Fouser, P.E., who performed testing at her residence on October 27, 2020. The report indicates a sample from the master bathroom sink in her house tested negative for Pseudomonas. We note references were made to an OSHA investigation report, and there were references to exhibits in the depositions of both Dr. Cecil and Dr. Archer; however, there is no indication in the LMS records that such report was ever filed into evidence. Although referenced, no exhibits were attached to any of the depositions.

In support of her claim, Whisman filed Dr. Cecil's January 18, 2021 office note. He diagnosed her with chronic sinusitis. He noted she had recently undergone surgical debridement and she remained symptomatic despite normal endoscopy results. He noted she was taking oral and topical antibiotics. He additionally noted she smokes a half pack of cigarettes per day. Dr. Cecil testified by deposition on November 29, 2021. He has been an otolaryngologist since 2006. He first saw Whisman for treatment on February 19, 2020. She presented with symptoms of chronic sinusitis, including facial pain and pressure, nasal obstruction, mucus, and drainage from the nasal cavity. A CT-scan revealed evidence of chronic sinus infection. He noted she had previously undergone sinus surgery, and he recommended a revision surgery. He also noted that during his course of treatment, Pseudomonas has always been present in Whisman's cultures. He additionally noted Whisman has undergone multiple nasal endoscopies and multiple cultures have been taken.

Dr. Cecil only performed one surgery on Whisman's sinuses. He performed three or four nasal washings afterward, and he prescribed several medications. He does not believe additional surgery is necessary. He diagnosed Whisman with chronic sinusitis. He stated she

was theoretically exposed to Pseudomonas at work, although he did not specifically research this issue. He testified this reference was based upon Whisman's narrative. He stated Whisman has reached maximum medical improvement ("MMI"). He recommended she use saline rinses and nasal steroid sprays. He stated it is reasonable for Whisman to return to work at Toyota. When he last saw Whisman on October 25, 2021, her sinuses were normal, and her primary complaints were with unrelated shortness of breath.

Dr. Cecil testified he is unsure if the Pseudomonas is merely present or causing Whisman's symptoms. He noted she has had sinus problems for a long time. He additionally noted there is a difference between a Pseudomonas infection and a colonization. He stated Pseudomonas is a common finding in chronic sinusitis. He noted it is possible, not probable, that Pseudomonas caused Whisman's colonization. He also testified he is unsure as to what the OSHA report reflects. When asked if exposure to Pseudomonas in the coolant at Toyota could independently cause Whisman's disease, Dr. Cecil specifically testified as follows:

> I think that that's – I mean it's – you know, I'm not an occupational hazard physician. But if there's Pseudomonas in the potential air and she's getting Pseudomonas in her respiratory system, you know, just putting two and two together it makes sense that that could be where this is coming from.

Dr. Cecil testified that his statement regarding how Whisman contracted Pseudomonas was expressed within a reasonable degree of medical probability. Later in his deposition, Dr. Cecil stated, "Maybe probable's not the right word not having known this, but I'm kind of putting two and two together so I think it's potentially a cause." He also testified, "So, you know, I think it's probably more reasonable to put 'possible.' I don't know that I'm

the person to be able to determine if it directly came from the coolant or where it came from."

When asked if exposure to the coolant at Toyota caused Whisman's sinus problems, Dr. Cecil testified verbatim as follows:

> I definitely – well, I mean I don't know about independently. I mean certainly I've operated on her before there's been purulence in her sinus cavities that grew Pseudomonas so that was certainly a pathogenic organism that was in her sinuses and was causing it. I don't know if that's the only cause of it, but certainly that was part of it.

Dr. Cecil testified that although he reviewed an OSHA report that identified Pseudomonas, it did not indicate the level of exposure. He also testified he does not have the experience to know what the exposure would mean. He likewise testified he has no idea whether Pseudomonas in coolant within a machine would be an exposure causative of her condition.

Whisman subsequently filed numerous office records from Dr. Cecil representing 15 office visits from March 27, 2020 to January 18, 2021. Dr. Cecil treated Whisman for sinusitis and asthma. His treatment included a surgery consisting of a debridement, multiple endoscopic washings, and medication. Dr. Cecil noted Whisman's 20-year history of smoking a half of a pack of cigarettes daily. He noted she has chronic sinusitis, and she has been dealing with Pseudomonal sinusitis for a significant period. Whisman also filed Dr. Cecil's records for treatment on five occasions between March 3, 2021 and July 14, 2021.

Those records reflect treatment for chronic sinusitis, dental pain, pressure in her face, blurry vision, and nasal

congestion. Routine cultures dated April 12, 2021 and June 17, 2021, revealed heavy growths of Pseudomonas. Whisman filed an application for short-term disability benefits she completed for Lincoln Financial Group on July 6, 2020. Dr. Cecil completed a portion of that form on July 10, 2020. Dr. Cecil noted Whisman has chronic sinusitis. He also noted she was unable to work due to the national health crisis. The form does not reflect whether the condition was work-related.

Dr. James Owen evaluated Whisman at her attorney's request on December 21, 2021. He stated Whisman has had recalcitrant Pseudomonas since 2018, which has been treated intermittently, and her condition has worsened. He stated her condition is due to exposure to engine coolant spray in her workplace. Dr. Owen diagnosed Whisman with chronic sinusitis exacerbated by her returns to work, which is associated with chronic facial pain. He noted he could not make a definitive diagnosis regarding her facial pain. Dr. Owen opined her conditions were caused by her workplace exposure. He found she has reached MMI. He assessed a 6% impairment rating based upon the American Medical Association *Guides to Evaluation of Permanent Impairment, 5th Edition ("AMA Guides")*. He found she had no underlying conditions prior to 2014, and none of her impairment rating is due to pre-existing active conditions. Dr. Owen additionally stated Whisman does not have the physical capacity to return to the type of work performed at the time of her injury.

Dr. Brent Mortenson, a maxillofacial surgeon, examined Whisman on April 28, 2022. Whisman complained of pain and swelling in the left submandibular space. He noted she had a tender lymph node in that area. He also noted she has experienced sinus issues for which she was treating with Dr. Cecil. He found her oral examination and dentition within normal limits. Dr. Mortenson stated he believed her problems stem from her sinuses.

Dr. Archer evaluated Whisman on June 22, 2021, as the university evaluator pursuant to KRS[3] 342.315. He noted Whisman complained of migraine headaches, dizziness, atypical facial pain, and sinusitis beginning in 2013. At her evaluation, Whisman attributed all her symptoms to the work environment. Dr. Archer diagnosed Whisman with atypical facial pain, migraine headaches (by history), no acute or chronic sinus disease, and non-otologic dizziness. He determined she is not entitled to an impairment rating pursuant to the *AMA Guides* attributable to her complaints allegedly caused by her work environment. Dr. Archer found neither Whisman's condition nor her complaints were caused by her work environment. He likewise determined she has no pulmonary impairment caused by the work environment. He determined Whisman has the physical capacity to return to her previous work at Toyota. He recommended no restrictions. Dr. Archer noted Whisman has an eleven pack-year smoking history, and she continues to smoke.

Dr. Archer testified by deposition on December 13, 2021. He is a board-certified ENT (otolaryngologist). Dr. Archer testified that Dr. Cecil is respected in the medical community; however, he does not agree with everything Dr. Cecil described. He noted Dr. Cecil diagnosed Whisman with chronic sinusitis on July 22, 2021. Dr. Archer did not review a 2020 CT-scan indicating Whisman has a chronic infection. He stated Pseudomonas is a chronic bacteria seen in infectious sinusitis. When Dr. Archer examined Whisman, she had no abnormal findings so there was no basis to assess an impairment rating pursuant to the *AMA Guides*. He noted no pathological findings were present except for those consistent with her previous surgeries, meaning some bone structure had been removed. Dr. Archer

---

[3] Kentucky Revised Statutes.

does not believe Whisman's complaints are caused by chronic sinusitis.  Dr. Archer specifically testified verbatim as follows:

> Chronic sinusitis is classically defined as chronic infection of the sinuses that have lasted three months or longer, persisted despite medical or surgical management.  It can be caused by any number of things that can block the sinuses, including allergies, mass lesions, like polyps, anatomic variance like septal deviations and abnormal turbinate structures.  It can be caused by bacteria, fungus.  Viral inflammation can set it up as well.  And when the sinuses get blocked, they can potentially stay blocked and give that chronic nature to an acute sinus infection.

Dr. Archer additionally testified verbatim as follows:

> Her symptoms were pretty much out of proportion to what her findings were.  She had on my examination and on Dr. Saini's previous examination two years prior complaints of atypical facial pain and neither his examination nor my examination identified any pathology on her in her sinuses.  And because she's had extensive sinus surgery, we actually have the opportunity of placing scopes into the sinus, not just into the nose, to examine those areas and the scans that were referred to at the time did not show any evidence of acute or chronic sinusitis either.  And so the atypical facial pain can come from many different regions and we recommended that she see basically a orofacial pain clinic here for further evaluation of her complaints.

Toyota submitted Dr. Shashy's treatment records from July 11, 2014 through September 16, 2014. Those records reflect Whisman initially reported problems with migraine headaches, dizziness, fatigue, and facial swelling. Whisman reported she had weight gain, vision loss, eye pain, ear drainage, and hearing loss. Dr. Shashy diagnosed her with chronic sinusitis, mucus retention, chronic rhinitis, and remnants of migraine, not otherwise specified. On July 16, 2014, Dr. Shashy recommended nasal irrigation with normal saline, endoscopic sinus surgery, and possibly a septoplasty. Dr. Shashy proceeded with the septoplasty, and followed up with Whisman on August 22, 2014. He noted she had undergone a septoplasty, a partial resection of the inferior turbinate on both sides, a total ethmoidectomy on both sides, a middle meatal anstrostomy on both sides, a sphenoidectomy on both sides, and sinus surgery. He noted it was too early to assess her nasal obstruction and whether she had any recurrent sinus infections. In addition to his previous diagnoses, Dr. Shashy noted Whisman had a deviated septum. Dr. Shashy saw Whisman again on August 26, 2014. She presented for sinus debridement. In addition to the previous diagnoses, he noted she has tobacco use disorder and migraines. Dr. Shashy next saw Whisman on September 9, 2014. She continued to complain of dizziness and allergic rhinitis. He again saw Whisman on September 16, 2014 for a follow up regarding her sinuses and postnasal drip.

Toyota filed Dr. Leslieann Asbury's October 24, 2018 office note. Dr. Asbury is with Ear, Nose, and Throat Specialists of Central Kentucky. She noted Whisman's history of sinus problems, and the previous surgery performed by Dr. Shashy. Whisman's symptoms included excessive dizziness, ear pain and fullness, pain and pressure in the right cheek area, and dental pain. Whisman reported her symptoms never resolved after the previous surgery. Her symptoms recently increased after moving molded furniture. Dr. Asbury diagnosed

Whisman with seasonal allergic rhinitis due to fungal spores, a history of sinus surgery, and dizziness.

(Record ("R.") at 454-63.)

The ALJ held a final hearing on April 1, 2022, after which the parties submitted post-hearing briefs. On May 31, 2022, the ALJ rendered his opinion and order dismissing Whisman's claim on the basis that she had not submitted sufficient proof on the element of causation. Specifically, the ALJ concluded:

> There is no doubt Whisman has chronic sinusitis. The evidence on the cause of that condition is murky. It may be that Whisman was exposed to Pseudomonas at work but the exposure itself and any link between it and the onset of her symptoms is questionable. Dr. Archer's opinion on the question of causation is what is most important to the ALJ. He did not find a link between Whisman's alleged work-related exposure and her chronic sinusitis. In truth, the ALJ also interprets Dr. Cecil's testimony as being less than clear on the question of causation. He did not have any expertise as to the level of exposure or what would be required to cause the onset of chronic sinusitis. In light of the foregoing, the ALJ finds Whisman has failed to persuade the ALJ her chronic sinusitis is the result of occupational exposure to Pseudomonas. For that reason, her claim is dismissed.

(R. at 412.)

Whisman filed a petition for reconsideration which the ALJ denied. Thereafter, she appealed to the Board. She asked the Board to reverse the ALJ's dismissal, arguing that the ALJ should not have afforded the University Evaluator, Dr. Archer, presumptive weight or relied on his opinions because they were based

-11-

on a substantially inaccurate or largely incomplete history, and therefore should

have been discounted pursuant to *Cepero v. Fabricated Metals Corporation*, 132

S.W.3d 839 (Ky. 2014). The Board affirmed the ALJ holding:

> When the question of causation involves a medical
> relationship not apparent to a layperson, the issue is
> properly within the province of medical experts. *Mengel
> v. Hawaiian-Tropic Northwest and Central Distributors,
> Inc.*, 618 S.W.2d 184, 186-187 (Ky. App. 1981).
> Medical causation must be proven by medical opinion
> within "reasonable medical probability." *Lexington
> Cartage Company v. Williams*, 407 S.W.2d 395 (Ky.
> 1966). The mere possibility of work-related causation is
> insufficient. *Pierce v. Kentucky Galvanizing Co., Inc.*,
> 606 S.W.2d 165 (Ky. App. 1980).
>
> Whisman argues the ALJ erred by relying on medical
> opinions which were based upon a corrupt history.
> Specifically, Whisman contends Dr. Archer did not
> review the entirety of the medical record, and was not
> provided with the OSHA report, therefore he could not
> competently provide any determination. She argues
> Dr. Archer's conclusions are so flawed and corrupt they
> cannot constitute substantial evidence. Therefore, they
> cannot be relied upon and should be excluded based upon
> the holding in *Cepero v. Fabricated Metals Corp. supra*.
>
> . . .
>
> This claim is distinguishable from the facts in *Cepero*
> and the Board does not conclude the doctors' opinions
> expressed were based on a corrupt history. In fact, Dr.
> Archer noted Whisman's history of sinus problems
> including her surgical procedures. He did not have all
> her medical records; however, his report generally
> reflects an accurate history of her condition and
> treatment. He also noted she reportedly attributed her
> sinusitis to exposure of Pseudomonas at work. Dr.

Archer, however, found there was no evidence Whisman had sinusitis at the time of his examination. This case is distinguishable from *Cepero* and we note that in this instance there was no deception hoisted [*sic*] on the medical examiners.

As fact-finder, the ALJ is entitled to pick and choose among conflicting medical opinions. *Pruitt v. Bugg Brothers*, 547 S.W.2d 123 (Ky. 1977). While Dr. Owen offered a different opinion, and Dr. Cecil's opinions were equivocal, the ALJ chose to rely upon the opinion of Dr. Archer, the university evaluator. We note KRS 342.315 states in relevant part:

> [T]he clinical findings and opinions of the designated evaluator shall be afforded presumptive weight by administrative law judges and the burden to overcome such findings and opinions shall fall on the opponent of that evidence. When administrative law judges reject the clinical findings and opinions of the designated evaluator, they shall specifically state in the order the reasons for rejecting that evidence.

KRS 342.315(2) generally requires affording presumptive weight to the clinical findings and opinions of a university evaluator. An ALJ has the discretion to reject such testimony where it is determined the presumption has been overcome by other evidence and the reasons for doing so are expressly stated within the body of the decision. *Bullock v. Goodwill Coal Co.*, 214 S.W.3d 890, 891 (Ky. 2007); *Morrison v. Home Depot*, 197 S.W.3d 531, 534 (Ky. 2006); *Magic Coal Co. v. Fox*, 19 S.W.3d 88, 94-95 (Ky. 2000). Whether a party overcomes the presumption established pursuant to KRS 342.315(2) is not an issue of law, but rather a question of fact at all times subject to the ALJ's discretion as fact-finder to pick and choose from the evidence. *Id.* KRS 342.315(2) does not alter the claimant's burden of

persuasion but, "[t]o the extent that the university evaluator's testimony favors a particular party, it shifts to the opponent the burden of going forward with evidence which rebuts the testimony. If the opponent fails to do so, the party whom the testimony favors is entitled to prevail by operation of the presumption." *Id.* at 96. Accordingly, "clinical findings and opinions of the university evaluator constitute substantial evidence with regard to medical questions which, if uncontradicted, may not be disregarded by the fact-finder." *Id.*

. . .

The ALJ based his decision on the opinions of Dr. Archer, the university evaluator, and to a lesser extent the testimony and office notes of Dr. Cecil in determining Whisman failed to establish she sustained an injurious exposure to Pseudomonas at Toyota, and in dismissing her claim. As noted by the ALJ, Dr. Cecil testified he could not state Whisman sustained an injurious exposure to Pseudomonas at work which would independently cause her sinusitis. Dr. Archer opined Whisman did not have sinusitis when he examined her, but he noted her history of that condition. Although Dr. Owen opined Whisman's condition was caused by her exposure to Pseudomonas at work, that only constitutes a contrary opinion upon which the ALJ could have relied, and does not compel a contrary result.

Whisman was required to first prove she has chronic sinusitis, and then she must show her condition was caused by an exposure at work. Likewise, she was required to prove such exposure could independently cause her condition. The ALJ determined Whisman first experienced sinus problems long before she worked in the portion of Toyota's facility where Pseudomonas was purportedly found. There is also no evidence of record, other than Whisman's assertions, that Pseudomonas is actually present at Toyota. Dr. Cecil testified he could not determine whether any exposure at Toyota could

-14-

have independently caused her condition.  He noted there is no evidence of the level of exposure, or whether Pseudomonas within a machine could even cause an exposure, and ultimately her sinusitis.  We find the ALJ appropriately reviewed the evidence and exercised his discretion in determining Whisman failed to establish she contracted sinusitis due to Pseudomonas she may have encountered at Toyota.  The ALJ enumerated the basis for his dismissal of Whisman's claim.  The ALJ acted within the scope of his authority in determining which evidence to rely upon, and it cannot be said his conclusions are so unreasonable as to compel a contrary result. *McCloud v Beth Elkhorn Corp., supra*.  The ALJ's determination is supported by substantial evidence, and a contrary result is not compelled; therefore, we affirm.

(R. at 468-72.)  This appeal by Whisman followed.

## II. Standard of Review

Pursuant to KRS 342.285, the ALJ is the sole finder of fact in workers' compensation claims.  Our courts have construed this authority to mean the ALJ has the sole discretion to determine the quality, character, weight, credibility and substance of the evidence and to draw reasonable inferences from that evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985); *McCloud v. Beth-Elkhorn Corp.*, 514 S.W.2d 46, 47 (Ky. 1974).  Moreover, an ALJ has sole discretion to decide whom and what to believe and may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977).  On review,

-15-

neither the Board nor the appellate court can substitute its judgment for that of the ALJ as to the weight of evidence on questions of fact. *Shields v. Pittsburgh & Midway Coal Mining Co.*, 634 S.W.2d 440, 441 (Ky. App. 1982).

If the fact finder finds in favor of the person having the burden of proof, the burden on appeal is only to show that there was some substantial evidence to support the decision. *See Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). However, if the ALJ finds against the party having the burden of proof, the appellant must "show that the ALJ misapplied the law or that the evidence in [his] favor was so overwhelming that it compelled a favorable finding." *Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005).

On appeal, our role "is to correct the Board only where . . . the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *ViWin Tech Windows & Doors, Inc. v. Ivey*, 621 S.W.3d 153, 157 (Ky. 2021) (quoting *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992)).

### III. ANALYSIS

Just as she did before the Board, Whisman argues to this Court that the ALJ erred by relying on Dr. Archer's report. She contends that the ALJ should have disregarded Dr. Archer's report because he did not review all her prior

-16-

medical records and failed to correctly diagnose her as suffering from chronic sinusitis.

In *Cepero*, an ALJ awarded a claimant benefits for an alleged work-related knee injury based upon evidence from two doctors who indicated that his knee condition was related to a work injury. However, neither doctor had been informed that Cepero had suffered a severe knee injury several years prior. *Cepero*, 132 S.W.3d at 842. The Board reversed the ALJ's finding that the doctors' opinions were based upon substantial evidence and therefore sufficient to support findings of causation. The Supreme Court of Kentucky affirmed, quoting the Board's holding:

> [I]n cases such as this, where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being *substantially inaccurate or largely incomplete*, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence. Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable.

*Cepero*, 132 S.W.3d at 842 (emphasis added).

In *Eddie's Service Center v. Thomas*, 503 S.W.3d 881, 889 (Ky. 2016), the Supreme Court of Kentucky applied *Cepero* to hold that an ALJ has the discretion to reject a medical report based on a substantially inaccurate understanding of the facts and medical history. *Id*. at 887-89. Our Supreme Court

held that because of a number of internal consistencies within the report, along with the doctor's inaccurate understanding of the facts, the report could not constitute substantial evidence. *Id.* at 889. "Evidence is substantial if it is of 'relevant consequence having the fitness to induce conviction in the minds of reasonable men.'" *Id.* at 887 (quoting *Smyzer v. B.F. Goodrich Chemical Co.*, 474 S.W.2d 367, 369 (Ky. 1971)).

Finally, this Court held in *GSI Commerce v. Thompson*, 409 S.W.3d 361 (Ky. App. 2012), that an ALJ was not required to disregard a medical report that was "not 'unsupported by other credible evidence.'" *Id.* at 365. In that case, an employer contended that a physician's report could not be considered because it did not mention a prior relevant injury; however, the doctor explained during deposition that he was aware of the claimant's past injury. *Id.* We differentiated between *GSI Commerce* and *Cepero*, stating "[i]n *Cepero*, there was a ***complete omission*** of a significant and clearly relevant past injury . . . [and] the medical opinion described in *Cepero* was completely unsupported by any other credible evidence." *Id.* at 364 (emphasis in original). Conversely, in *GSI Commerce*, the physician making the report was aware of the prior injury and there was other evidence before the court corroborating the physician's opinion. *Id.* at 365.

We are not convinced that the facts before us are analogous to those of *Cepero* or *Eddie's Service Center*. Rather, we are persuaded that the facts

-18-

before us most closely resemble those of *GSI Commerce*. Dr. Archer's Form 108 report reveals that he had an accurate understanding of Whisman's prior medical history, even if he did not have access to all her prior medical records. He specifically indicates in the report that Whisman's sinus complaints dated back to 2013 and that she attributes those problems to her work. (R. at 93.)

Additionally, Dr. Archer conducted his own examination of Whisman. He explained in his deposition that he did not note any "pathologic" abnormalities when he examined her sinus cavities. (R. at 166.) He concluded that while Whisman did have sinusitis at one time, she was not actively experiencing chronic sinusitis at the time of his examination. He explained that in his opinion:

> Her symptoms were pretty much out of proportion to what her findings were. She had on my examination and on Dr. Saini's previous examination two years prior complaints of atypical facial pain and neither his examination or my examination identified any pathology on her in her sinuses. And because she's had extensive sinus surgery, we actually have the opportunity of placing scopes into the sinus, not just into the nose, to examine those areas and the scans that were referred to at the time did not show any evidence of acute or chronic sinusitis either.

(R. at 167.) We cannot disagree with the Board's decision refusing to direct the ALJ to reconsider the evidence without consideration of Dr. Archer's report.

Moreover, even though Dr. Cecil diagnosed Whisman with chronic sinusitis, he clarified in his deposition that he was unable to conclude with

-19-

reasonable medical probability that Whisman's condition was caused by any exposure in her workplace. He was only able to conclude that it was possible.

The operative question in this case was whether the evidence was so overwhelming that it compelled a favorable finding. The ALJ properly considered all the evidence, much of which cast doubt on Whisman's theory that the machine mist at Toyota caused her sinusitis. As correctly noted by the ALJ, Whisman's sinus issues predated her assignment to the machine area at Toyota and manifested themselves at times when she was not working in that area. Both Dr. Cecil and Dr. Archer explained that sinusitis can be caused by a number of different factors and that Pseudomonas is a common bacteria found in many different places in our everyday environments.

The Workers Compensation Act "requires only that exposure could independently cause the disease – not that it did in fact cause the disease." *Miller v. Tema Isenmann, Inc.*, 542 S.W.3d 265, 271 (Ky. 2018). This is where Whisman's claim fails. While Dr. Cecil opined that Pseudomonas could cause sinusitis, he was unable to testify whether the levels detected in the machine mist at Toyota were of a sufficient quantity to independently do so. Dr. Owen's report indicates that working at Toyota "exacerbates" and is "associated with" Whisman's sinusitis but he did not opine that Whisman's work at Toyota could have independently caused her issues. (R. at 207.) In short, there is an absence of

-20-

proof in the record to support that the levels of Pseudomonas allegedly detected at Toyota could have independently caused Whisman's chronic sinusitis.[4]

## IV. CONCLUSION

In light of the foregoing, we affirm the decision of the Workers' Compensation Board.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE TOYTOA MOTOR MANUFACTURING KENTUCKY, INC.: |
|---|---|
| Charles W. Gorham Lexington, Kentucky | |
| | Kenneth J. Dietz Florence, Kentucky |

---

[4] Like the Board, we note that while the Whisman repeatedly references OSHA testing having been conducted at Toyota, there is no proof in the record that confirms that Pseudomonas was actually ever detected at Toyota.